UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 26-20081-CR-ALTMAN

UNITED STATES OF AMERICA,

vs.

EMMANUEL SYLVESTRE,

Defendant.
_______________________________/

**REPLY IN SUPPORT OF AMICUS MEMORANDUM AND AMENDED MOTION TO DISMISS COUNT 2**

Emmanuel Sylvestre, through undersigned counsel, respectfully replies in support of Paul D. Clement's Amicus Memorandum[1] and the Amended Motion to Dismiss Count 2. (DE 47). As explained below, and in the previously-filed briefing, Count 2 must be dismissed because 18 U.S.C. § 611 is an unconstitutional exercise of congressional authority.

The Government cannot rebut the constitutional deficiencies in § 611 identified by Mr. Clement. Indeed, the Government's Response holds firm to its earlier lodged arguments. (DE 50). But those arguments lack constitutional or precedential support.

For starters, the Government continues to rely almost exclusively on *Oregon v. Mitchell*, 400 U.S. 112 (1970), contending that "a fractured decision's holding binds even if its reasoning does not." (DE 50 at 9 (quoting *Myrick v. Freuhauf*

[1] This filing will cite to Mr. Clement's Amicus Memorandum in *United States v. Cox*, Case No. 25-cr-60249 (S.D. Fla.) (DE 46) with the abbreviation "Memo."

*Corp.*, 13 F.3d 1516, 1523 (11th Cir. 1994)). The dispute is not whether *Mitchell*'s judgment remains binding. It does. The question is *what* that judgment has decided. Although *Mitchell* resolved several challenges to federal voting legislation, no majority endorsed a general congressional power to prescribe voter qualifications in federal elections. To the contrary, five Justices rejected that proposition. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16 n.8 (2013) (hereinafter "*ITCA*").

The Government claims that *ITCA*'s discussion of *Mitchell* "was not necessary in deciding *ITCA*[.]" (DE 50 at 6). But the Supreme Court expressly considered *Mitchell* and identified the proposition that informed its analysis. Specifically, *ITCA* explained that "[f]ive Justices took the position that the Elections Clause did *not* confer upon Congress the power to regulate voter qualifications in federal elections," and recognized that this "view, which commanded a majority in *Mitchell*, underlies [*ITCA*'s] analysis[.]" *ITCA*, 570 U.S. at 16 n.8 (emphasis in original). The Government simply disagrees with the very understanding of *Mitchell* that the Supreme Court said underlay *ITCA*.

As Mr. Clement explained, "[r]eading *Mitchell* to its limits and as if it were the Supreme Court's last word would defy both the Supreme Court's general teaching that its 'opinions dispose of discrete cases and controversies and . . . must be read with a careful eye to context,' . . . and the Supreme Court's own treatment of *Mitchell* in *ITCA*." (Memo. at 39 (internal citation omitted)). The Government thus seeks not merely to apply *Mitchell*'s judgment, but to extract from that fractured

decision a broad constitutional rule that a majority of the Justices expressly rejected. The Supreme Court reiterated in no uncertain terms that "[p]rescribing voting qualifications . . . 'forms no part of the power to be conferred upon the national government' by the Elections Clause." *ITCA*, 570 U.S. at 17.

The Government also tries to distinguish *ITCA* because the Supreme Court did not directly "consider the constitutionality of a congressional statute or require it to determine the extent to which Congress may regulate who votes in federal elections." (DE 50 at 5). But far from just a statutory preemption case, *ITCA* contained a fulsome discussion of the Elections Clause and addressed the scope of Congress' authority to govern the "Times, Places, and Manner" of elections in the context of the Arizona law at issue. *ITCA*, 570 U.S. at 8–12 (discussing the Elections Clause with respect to Congress' authorization to enact and enforce the federal voter registration form). Perhaps more importantly, *ITCA* also rejected Arizona's argument that its law was not preempted because Arizona maintained "constitutional authority to establish qualifications (such as citizenship) for voting." *See id.* at 15–16. In rejecting Arizona's argument, *ITCA* recognized the framers' concerns about enabling Congress to regulate voter qualifications. *See id.* at 17. But *ITCA* ultimately held that the disputed Arizona law was not necessary to "enforcing [Arizona's] constitutional power to determine voting qualifications[.]" *Id.* at 19. In other words, *ITCA* acknowledged and addressed Arizona's right to regulate voter qualifications but held that those rights were not infringed upon by the federal law in question.

The Government next takes issue with Justice Scalia's treatment of *Mitchell* in *ITCA* and questions why Justice Scalia did not expressly address all the topics raised in *Mitchell*. (DE 50 at 6). In so arguing, the Government seems to suggest that because *ITCA* did not overrule *Mitchell*, the Court should parse through *Mitchell*'s plurality opinion like it has. But there is no need to parse the fractured opinions in *Mitchell* when *ITCA* makes clear that Congress does not have the power to prescribe voter qualifications. *See ITCA*, 570 U.S. at 17. As noted by the Government, it should leave to the Supreme Court "the prerogative of overruling its own decisions" and "should follow the case which directly controls." (DE 50 at 8) (citation omitted). In this case, that is *ITCA*.

Next, the Government asserts that this Court should look to guidance from *Watson v. RNC*, 146 S. Ct. 2165 (2026). In *Watson*, the Supreme Court held that a Mississippi law that decided until when absentee ballots could be received was not preempted by federal law. *Id.* at 2169. But unlike *ITCA*—another preemption case—*Watson* did "not consider the scope of Congress's authority to regulate federal elections." *Id.* at 2172. It is unclear what then, if anything, *Watson* can say about whether Congress exceeded its authority in enacting § 611.

To be sure, Mr. Clement acknowledges that finding § 611 unconstitutional "may or may not" endanger the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") discussed in *Watson*. (DE 46 at 50–52). The Government warns of this potential consequence by stating that "[i]f UOCAVA were to be held unconstitutional, any resulting harm would not be to the states but to overseas

citizens who might have become excluded from future federal elections . . . ." (DE 50 at 8 n.4). To this point, *Watson* has a clear answer: "policy arguments are properly directed to legislatures, not courts." *See Watson*, 146 S. Ct. at 2180. At bottom, whether a ruling on the constitutionality of § 611 will spell the end of UOCAVA is uncertain. What is clear is that *Watson* did not confront the issues raised here regarding the scope of congressional authority over voter qualifications. On this issue, *ITCA*'s mandate is clear. *See ITCA*, 570 U.S. at 17 (holding that the national government has no power to prescribe voter qualifications).

Lastly, the Government falls back on Congress' "broad authority over immigration and foreign affairs" to sustain the constitutionality of § 611. (DE 50 at 9). But the existence of substantial federal power over a subject does not resolve whether Congress may exercise that power in a manner foreclosed by another constitutional provision. As Mr. Clement explains, "[e]ven so-called plenary powers cannot override foundational constitutional constraints." (Memo. at 32 (quoting *Haaland v. Brackeen*, 599 U.S. 255, 276 n.3 (2023))). The relevant question, therefore, is not whether Congress possesses substantial authority over immigration and aliens. It plainly does. The question is whether that authority permits Congress to displace the Constitution's express allocation of authority over voter qualifications. It does not.

The Government's reliance on Justice Stewart's opinion in *Mitchell* does not establish otherwise. Justice Stewart addressed whether Congress could restrict state residency requirements to protect the constitutional right of citizens to travel

between States. *See Mitchell*, 400 U.S. at 285–86, 291–92 (opinion of Stewart, J.). His analysis depended on the existence of an independently protected constitutional right and Congress' authority to protect that right when the States could not effectively do so. *Id.* at 292. Section 611 serves a fundamentally different function. It does not protect an individual's constitutional right from state interference. Instead, it imposes a federal voter qualification without regard to the qualification selected by the State. Justice Stewart's reasoning therefore does not support the general authority the Government claims here. All told, the Government asks this Court to treat a non-binding opinion in *Mitchell* as though it said far more than it did. This Court should reject the Government's request.

Nor does characterizing § 611 as a measure against "foreign interference" cure the problem. (DE 50 at 10). Section 611 does not require proof that a defendant acted on behalf of a foreign government, coordinated with a foreign actor, or intended to influence an election for a foreign purpose. It categorically prohibits a noncitizen from voting in a federal election—even if the relevant State has affirmatively authorized that person to vote. *See* 18 U.S.C. § 611(a). The Government's foreign-interference rationale thus does not alter what the statute impermissibly does: prescribe *who* may vote in a federal election.

In addition, the Government emphasizes policy considerations regarding its authority over immigration and foreign affairs to support the constitutionality of § 611. (DE 50 at 9–10) ("States, on their own, are not equipped to handle matters of immigration or foreign affairs and are not well situated to assess the extent to

which foreign countries may be attempting to influence federal elections."). *Watson* acknowledged how the Constitution's protection of states' rights can conflict with serious national concerns, although not in the way the Government hopes. Specifically, *Watson* recognized that "[e]lection fraud and its appearance are serious issues," but "[l]ike other such issues . . . they must be addressed through the democratic process." *Watson*, 146 S. Ct. at 2180. In other words, constitutional infirmities cannot give way to policy considerations, no matter how serious.

Importantly, as Mr. Clement notes, there are potential alternative, constitutional ways to prevent and punish noncitizen voting. (Memo. at 51–52). For example, "Congress would appear to be able to enact a law that criminalizes alien voting in violation of state law." (Memo. at 51). Or Congress could propose a constitutional amendment "that would reserve the right to vote in federal elections to citizens." (Memo. at 51–52). Indeed, that option is already in the works. (*See* Memo. at 51–52 (noting Representative Laurel Lee of Florida's joint resolution regarding same)). Simply put, that § 611 is unconstitutional does not mean noncitizen voting cannot be regulated. It can be, just not in the way it is now.

Finally, the Government disputes Mr. Clement's distinction between federal campaign finance and voter qualification laws. (DE 50 at 11). It questions why "the framers were more protective of a state's right to establish the qualification of voters in federal elections" than the role of campaign money in elections. (DE 50 at 11) (emphasis removed). But the reason why the framers were so protective of a state's right to set voter qualifications is unambiguously clear. As explained in

*ITCA*, the framers' protectiveness stems from their "aversion to concentrated power." *ITCA*, 570 U.S. at 17. Further, "[a] Congress empowered to regulate the qualifications of its own electorate, Madison warned, could 'by degrees subvert the Constitution.'" *Id.* (citation omitted). The federal government's regulation of campaign finance laws does not implicate the same concerns raised by the framers with respect to voter qualification laws.

More fundamentally, the distinction between § 611 and the federal prohibition on foreign-national campaign contributions is not merely that the two statutes regulate different election-related conduct. Campaign-finance laws regulate the *means* by which foreign nationals may attempt to influence elections; they do not determine *who* belongs to the electorate. Section 611 does. And it is voter qualifications—not every subject touching elections or foreign nationals—that the Constitution expressly places beyond Congress' general Elections Clause authority. *See ITCA*, 570 U.S. at 16–17. The constitutionality of federal campaign-finance restrictions therefore says little about Congress' power to prescribe *who* may vote.

In sum, § 611 is an unconstitutional exercise of congressional authority. The Government's Response does not explain away § 611's constitutional infirmities. Consistent with Mr. Clement's Memorandum, and Mr. Sylvestre's briefing, this Court should grant the Amended Motion to Dismiss (DE 47) and dismiss Count 2 of the Indictment.

**Respectfully submitted,**

**HECTOR A. DOPICO**
**FEDERAL PUBLIC DEFENDER**

By: */s/Alexandra Hoffman*
Alexandra Hoffman
Assistant Federal Public Defender
Florida Bar No. 1011796
150 W. Flagler Street, Suite 1700
Miami, Florida 33130
Tel: 305-530-7000
E-Mail Address: alexandra_hoffman@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 25, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/Alexandra Hoffman*
Alexandra Hoffman